*Patrick M. Flatley*

Patrick M. Flatley
United States Bankruptcy Judge
**Dated: Wednesday, January 23, 2008 4:39:38 PM**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE:                                    )
                                          )
ALLEN B. SIMMS                            )   Case No. 06-1206
                                          )
                    Debtor.               )   Chapter 13

## <u>MEMORANDUM OPINION</u>

Allen B. Simms (the "Debtor") has annual income that exceeds the median income for his home State. On Schedules I and J, which reflect the Debtor's income and expenditures as of his Chapter 13 petition date of December 29, 2006, the Debtor claims to have net monthly disposable income of $921. After reevaluating the Debtor's expenses, the Chapter 13 trustee (the "Trustee") and Bank of America/FIA Card Services, formerly MBNA, by eCast Settlement Corporation ("eCast"), believe that the Debtor has net monthly disposable income of $1,288, and they seek to require the Debtor to commit that amount, on a monthly basis, to his Chapter 13 plan. The Debtor, however, only proposes to make monthly plan payments of $571 to his unsecured creditors,[1] which is the amount that the Debtor contends is owed to unsecured creditors after properly completing Form B22C, which implements the disposable income test of 11 U.S.C. § 1325(b) for above the median income debtors.

The issue presented in this case – whether the disposable income for an above-the-median income debtor is to be determined based on Form B22C or on Schedules I and J – is a matter of first impression for this District, albeit one that is being widely addressed elsewhere. Based on the facts of this case, the

---

[1] The Debtor is current on his secured debt payments; thus, no secured debt arrearage is being paid through the Trustee. According to the Debtor's claim register, $56,255 is the total of all filed, unsecured debts.

1

Court concludes that when an objection is filed under § 1325(b), Form B22C is the method by which the Debtor's disposable income is to be determined – it is not to be determined by deducting Schedule J expenses from the net income stated on Schedule I.  The court will also overrule certain objections filed to the Debtor's particular expense deductions on Form B22C, and will set a further hearing to allow the Debtor to demonstrate that he has home energy, food, and clothing expenses in excess of those allowed to him under the National and Local Standards promulgated by the Internal Revenue Service.

## I. BACKGROUND

At the time the Debtor filed his Chapter 13 bankruptcy, he was a director of safety at OVHSE, earning a gross monthly pay of $5,396.  The Debtor's non-filing spouse also worked outside the home and earned a gross monthly pay of $1,300.  After payroll deductions, the Debtor and his non-filing spouse had a net monthly income of $4,903.  On Schedule J, the Debtor claimed to have monthly expenses of $3,982, and the Debtor listed his actual disposable income at the time of filing as $921.

The Debtor and his spouse have no children, and the applicable median income for the Debtor's home State is $47,091.  Because the gross yearly income claimed by the Debtor is $81,692, and because that amount is greater than the State's applicable median income for the Debtor's household size, the Debtor completed Parts III, IV, and V of Form B22C.  The purpose of this Form is to apply a Congressionally imposed formula for determining the amount of money that a debtor must contribute on a monthly basis to unsecured creditors in Chapter 13 plan when the Trustee or a holder of an unsecured claim objects to confirmation on the grounds that the debtor is not submitting all of the debtor's disposable income to the proposed plan.  After making deductions that the Debtor believes to be appropriate, the Debtor claims that he is only required to make monthly plan payments of $571, and that he may keep his excess income from his creditors.

The Debtor has a 2001 Jeep and a 1991 Buick.  The Debtor owns the Buick outright.  According to eCast, monthly payments on the 2001 Jeep ($414.00) will continue until approximately month 41 of the Debtor's 60-month plan, and the Jeep is security for a loan made to the Debtor by Chrysler Financial.

## II. DISCUSSION

The Trustee, eCast, and the United States Trustee ("USTE") all object to the Debtor's proposed

monthly plan payments of $571. The issues raised by the parties for adjudication by the court are: (A) whether the disposable income calculation should be based on Schedules I and J in lieu of the calculation on Form B22C; and (B) if Form B22C is to be used, then did the Debtor appropriately take expense deductions when: (1) the housing and vehicle deductions were in excess of the Debtor's actual expenses, (2) the Debtor claimed a vehicle ownership expenses for a vehicle that the Debtor owned outright; and (3) the Debtor claimed home energy, food, and clothing expenses in excess of the National and Local Standards.

**A.      Disposable Income for Above-The-Median Income Debtors**

The amount of monthly disposable income that a Chapter 13 debtor must commit to the repayment of a debtor's creditors each month has been a source of contention at least since the inception of the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598. To understand the context in which present day disposable income test of 11 U.S.C. § 1325(b) was enacted, and for determining what "plain language" interpretation of § 1325(b) is the most appropriate, a brief examination of the history of the disposable income test is informative.

**1.      Coalescence of the Disposable Income Test of § 1325(b)**

**a.      Good Faith & Disposable Income**

After the passage of the Bankruptcy Reform Act of 1978, the amount of disposable income that a court required a debtor to commit to a Chapter 13 plan was governed by a standard of good faith, and no distinct disposable income test existed. 11 U.S.C. § 1325(a)(3) (1978). "Good faith," however was open to a wide array of interpretations, as observed by the Ninth Circuit:

> [C]ourts have vigorously debated whether "good faith" should be construed to require the substantial repayment of unsecured creditors in order to maintain the integrity of Chapter 13. Some . . . impose the requirement because "otherwise, a Chapter 13 case becomes nothing more than a Chapter 7 case without its attendant provisions." They fear a windfall to the debtor at the expense of his unsecured creditors. Other courts insist that an implied substantial repayment requirement would undermine Congress' effort to give as many debtors as possible a fresh start through Chapter 13's liberal discharge provisions and to make explicit the prerequisites for proceeding under Chapter 13.

*In re Goeb*, 675 F.2d 1386, 1388 (9th Cir. 1982) (citations and footnotes omitted).

Indeed, as observed by one scholar, "[n]othing in or about this [good faith requirement] gave any

hint that subsection 1325(a)(3) would prompt such a spate of discordant judicial opinion concerning whether the 'good faith' clause imposes minimum debt-repayment requirements as prerequisites to the confirmation of chapter 13 plans." Conrad K. Cyr, *The Chapter 13 "Good Faith" Tempest: Analysis and Proposal for Change* 55 Am. Bankr. L.J. 271, 272-73 (1981). *See also* Marianne B. Culhane & Michela M. White, *Catching Can-Pay Debtors: Is the Means Test the Only Way*, 13 Am. Bankr. Inst. L. Rev. 665, 681 (2005) ("Prior to 1984, some courts routinely approve zero-percent plans, while others required 70% or more, under the rubric of 'good faith.' [T]he loose 'all disposable income' standard failed to overcome local legal culture. There was no uniformity under that standard.").

   **b.**   **The Enactment of a Disposable Income Test**

  In the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, Congress attempted to end the spate of discordant judicial opinions on the amount of income that a debtor must commit to a Chapter 13 plan for that plan to be filed in good faith by creating a new disposable income test in § 1325(b). 8 *Collier on Bankruptcy* ¶ 1325.08[1] (Alan N. Resnick and Henry J. Sommer eds. 15th ed. rev. 2007) ("The amendment thus clarified that the 'good faith' standard of section 1325(a)(3) does not set any minimum amount or percentage of payments that must be made to unsecured creditors."). Under the 1984 amendment, a trustee or a holder of an allowed unsecured claim could object to confirmation of a Chapter 13 plan under § 1325(b) on the basis that the plan as proposed did not commit "all of the debtor's projected disposable income to be received in the three-year period . . . to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B) (1985). "Disposable income" was defined as "income which is received by the debtor and which is not reasonably necessary to be expended – (A) for the maintenance or support of the debtor or a dependent of the debtor . . . ." § 1325(b)(2)(A) (1985). Accordingly, ability to pay determinations under the previous "good faith" auspice of § 1325(a)(3) became more focused in that the substantial payment test was now statutorily defined in section 1325(b).

  Even with a statutory definition of "disposable income," however, courts still maintained a large amount of discretion to determine, inter alia, what amounts were "reasonably necessary to be expended" by a debtor. *See, e.g.*, *In re McNichols*, 249 B.R. 160, 170 (Bankr. N.D. Ill. 2000) ("There are . . . substantial luxuries budgeted which are not necessary for the reasonable support of the family. . . . The Debtor and her family need to tighten their proverbial financial belt to meet both the disposable income test

of § 1325(b)(2) and the good faith requirement of § 1325(a)(3).").  Indeed, in attempting to bring uniformity to the different treatment of minimum percentage plans under the good faith requirement, "Congress . . . unwittingly saddled Section 1325(b) with the same baggage of inconsistent judicial determination that it intended to eliminate."  Mindy L. Silver, *The Disposable Income Test: An Attempt Toward Uniformity*, 4 Bankr. Dev. J. 221, 237 (1987).

> **c.      BAPCPA's Amendments to the Disposable Income Test of § 1325(b)**

With the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, Congress significantly changed the disposable income test of § 1325(b). The statute now provides:

> (b)      (1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan--
>
>                                  . . .
>
> > (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.
>
> (2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor . . .  less amounts reasonably necessary to be expended–
>
> > (A)      (i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed;
> >
> >                                  . . .
> >
> > (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.
>
> (3) Amounts reasonably necessary to be expended under paragraph (2) . . . shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than [the median family income of the applicable State].

11 U.S.C. § 1325(b) (1-3).

Significantly, with regard to a calculation of a debtor's income, the term "disposable income," as it is used in § 1325(b)(2) means "*current monthly income* received by the debtor . . .  less amounts

reasonably necessary to be expended . . . ." (emphasis added). The term "current monthly income" is itself defined in § 101(10A), which states: "The term 'current monthly income' (A) means the average monthly income from all sources that the debtor receives . . . derived during the six month period ending on – (i) the last day of the calendar month preceding the date of the commencement of the case . . . ." Therefore, by definition, "current monthly income" is generally established as a six-month historical average. In contrast, Schedule I requires a debtor to list the debtor's income as of the date of the filing of the bankruptcy petition.

Also, with regard to the calculation of the debtor's expenses, § 1325(b)(3) provides that – for debtors who are above the applicable median income levels – expenses "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." Thus, unlike Schedule J, which details a debtor's actual expenses as of the petition date, § 1325(b)(3) requires that a debtor's expenses be determined in accordance with a melange of actual and artificial expense categories and amounts. *See Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256, H.R. Rep. No. 109-31*, Pt. 1, p. 553, 109th Cong., 1st Sess. (2005) ("The bill also makes substantial changes to chapter 13 by substituting the IRS expense standards to calculate disposable income . . . . [T]he formula remains inflexible and divorced from the debtor's actual circumstances.") (dissenting views). Debtors with "current monthly income" below the State's median are not explicitly bound by the artificial IRS expense standards. 11 U.S.C. § 1325(b)(3).

Therefore, "[c]alculating 'disposable income' for above-median-income debtors under the new section 1325(b) is now separated from a review of Schedules I and J and no longer turns on the court's determination of what expenses are reasonably necessary for the debtor's support." *In re Barr*, 341 B.R. 181, 186 (Bankr. M.D.N.C. 2006). Congress's formulation of the disposable income test in BAPCPA is its second attempt to bring greater uniformity to disposable income determinations. *See, e.g.*, *In re Gress*, 344 B.R. 919, 922 (Bankr. W.D. Mo. 2006) ("In enacting the means test, Congress intended to take away discretion from the courts as to higher income debtors, who were seen as abusers of the system. . . . [T]he use of the means test in this fashion allows debtors to propose plan payments based on a sort of parallel universe, which sometimes has little or nothing to do with their actual situation."); Hon. Keith M. Lundin, *Ten Principles of BAPCPA: Not What Was Advertised*, 24-7 A.B.I.J. 1, 69 (Sept. 2005)

("BAPCPA is packed with provisions intended to 'reduce the discretion' of bankruptcy judges. The self-proclaimed backbone of BAPCPA – the abuse test in § 707(b) – purports to be a mindless mathematical formula with fill-in-the-blank numbers and presumptions.").

Based on the evolution of the disposable income test – from the 1978 good faith auspices of § 1325(a)(3), to the 1984 statutory definition of disposable income in § 1325(b), to the "fill-in-the-blank" mechanical means test of 2005 – this court sees a clear trend to benumb the facts of individual cases in favor of uniform standards. *See*, *e.g.*, Rafael I. Pardo, *Eliminating the Judicial Function in Consumer Bankruptcy*, 81 Am. Bankr. L.J. 471, 472-73 (2007) ("The means test evinces a deep mistrust of the pre-BAPCPA discretion that had been exercised by the bankruptcy judiciary in its gatekeeper role under the substantial abuse dismissal regime . . . ."); Todd Zywicki, *Bankruptcy Criticisms*, National Review Online (March 15, 2005), at www.search.nationalreview.com (stating that under pre-BAPCPA law, "a judge uses his own subjective preferences to determine the debtor's allowed living expenses. The means-testing provision of the bill will bring some rationality to the system.").

Accordingly, any statutory interpretation of § 1325(b) should be considered in light of its statutory history.[2] *E.g.*, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ("Proper interpretation of [a statute] require[s] consideration of the statutory history . . . .").

2.      **"Projected" Disposable Income**

The Trustee and eCast assert that Form B22C, which implements the disposable income test of § 1325(b), should not be followed on the grounds that § 1325(b)(1)(B) requires that the Debtor's "*projected* disposable income" be determined, which, they argue, is best reflected in Schedules I and J. According to the Trustee and eCast, Form B22C should not be followed on the grounds that the Form is not properly forward looking.

---

[2] The USTE contends that § 1325(b) should be interpreted in light of the purpose of Chapter 13, which, it asserts, is to focus on having debtors devote their future income to creditors. As demonstrated, § 1325(b) is the provision by which this purpose is manifested; and as shown more fully herein, all parties agree that the Debtor will be devoting a portion of his future income stream to creditors under the plan. The issue under § 1325(b) is only how much of the Debtor's income must be devoted to the plan before the court can confirm the plan proposed by the Debtor in light of the Trustee's and eCast's disposable income objection.

The USTE disagrees that Form B22C can be completely discarded; however, the USTE urges the court to adjust the result of Form B22C based on the Debtor's actual income and expenses. The USTE asserts that the Debtor's historical income and means testing expense amounts are a starting point that should be carried forward throughout the term of the Debtor's plan, absent evidence to the contrary. In this manner, the court can take into consideration the Debtor's significant, future changes in income and expenses.

The Debtor argues that the language of the applicable statutes is straight-forward and that Form B22C, which implements the disposable income test of § 1325(b), is the only source for determining the amount that the Debtor must pay to unsecured creditors to have his proposed Chapter 13 plan confirmed.

### a.    Use of I & J to Determine Projected Disposable Income

Some authority exists supporting the Trustee's and eCast's position that Schedules I and J should be used to determine disposable income with respect to above the median income debtors. Although this authority recognizes that (1) the calculation of a debtor's disposable income in § 1325(b) is done with reference to a debtor's "current monthly income," which is generally defined in § 101(10)(A) to be a six-month historical average, and (2) that expenses for above-the-median income debtors are calculated pursuant to the means testing of § 707(b)(2) (A-B), as implemented by Form B22C, it reasons that the above computation can be largely ignored on the grounds that neither the determination of a debtor's "current monthly income," nor a determination of the debtor's expenses, as defined in § 707(b)(2)(A-B), is sufficiently forward looking to satisfy the "*projected*" nature of the disposable income test. *E.g.*, *In re Edmunds*, 350 B.R. 636, 646 (Bankr. D.S.C. 2006) ("[T]he the Court believes that the income component of projected disposable income is a forward-looking concept . . . . The court believes that the term 'projected disposable income' must be based on the debtor's anticipated income during the term of the plan, not merely an average of her prepetition income."); *In re Hardacre*, 338 B.R. 718, 722 (Bankr. N.D. Tex. 2006) (same).

In one of the first cases to discuss the meaning of the term "projected disposable income," the court reasoned Schedules I and J should be used instead of Form B22C for three reasons:

First, section 1325(b)(1)(B)'s use of the phrase "projected disposable income" rather than "disposable income" is instructive. The court is to presume that "Congress acts intentionally

and purposely when it includes particular language in one section of a statute but omits it in another. . . ." While Congress could have used the phrase "disposable income" in section 1325(b)(1)(B) and thereby invoked its definition as set forth in section 1325(b)(2), it chose not to do so. Consequently, Congress must have intended "projected disposable income" to be different than "disposable income."

Next, section 1325(b)(1)(B) refers to the projected disposable income "to be received in the applicable commitment period." If Congress had intended that projected disposable income for plan purposes be based solely on prepetition average income, this language would be superfluous. This suggests that Congress intended to refer to the income actually to be received by the debtor during the commitment period, rather than prepetition average income.

Finally, section 1325(b)(1) requires the court to determine whether a debtor is committing all of her projected disposable income "as of the effective date of the plan." 11 U.S.C. § 1325(b)(1). This language suggests that the debtor's income "as of the effective date of the plan" is the one that is relevant to the calculation of "projected disposable income," not her income prior to filing. Consequently, "projected disposable income" under section 1325(b)(1)(B) necessarily refers to income that the debtor reasonably expects to receive during the term of her plan.

*Hardacre*, 338 B.R. at 723.

In addition to the reasoning of *Hardacre*, eCast asserts that five different subsections of the Bankruptcy Code support its contention that both future income and future expenses must be taken into consideration, and, therefore, § 1325(b) must be forward looking: 11 U.S.C. §§ 521(a)(1)(B)(vi) (requiring the debtor to file a statement at the beginning of the case that discloses any reasonably anticipated increase in income or expenditures over the 12-month period following the filing of the petition); 521(f) (requiring the debtor to, on request, file a statement of income and expenditures of the debtor during the tax year most recently concluded); 1306(a)(2) (making a debtor's post-petition earnings property of the Debtor's bankruptcy estate); 1322(a)(1) (requiring that a plan provide for the submission of a debtor's future income); and 1329(a) (allowing for the post-confirmation modification of a Chapter 13 plan to, inter alia, increase payments to creditors). As argued by eCast, the provisions of these statutes would be surplusage if the terms of the Chapter 13 plan, especially the payment amount, were immutably fixed at confirmation.

Of course, under the reasoning of *Hardacre*, the Trustee, and eCast, § 1325(b)(3) and Form B22C, which implements the disposable income test of § 1325(b)(2-3), become rather superfluous. As such, resort is made, as was the practice before the effective date of BAPCPA, to Schedules I and J for a determination of the extent to which a debtor has disposable income. Thus, under this approach, little has changed from disposable income determinations as a result of the enactment of BAPCPA.

This court respectfully disagrees with *Hardacre's* reasoning, with eCast's characterization of the Bankruptcy Code, and with the argument of eCast and the Trustee that renders the changes made to § 1325(b) by BAPCPA supererogatory. The court disagrees because: (1) the court must give effect to the definition of "disposable income" in § 1325(b)(2); (2) the phrase "projected disposable income" is not new, and the general interpretation of that phrase pre-BAPCPA as Schedule I minus Schedule J multiplied by the length of the plan is consonant with BAPCPA's amendments to § 1325(b), whereas the pre-BAPCPA practice of using court discretion to adjust those numbers based on a debtor's actual circumstances is contrary to those amendments; (3) a debtor's first plan payment is due 30 days after the petition date, so using a debtor's pre-petition income to determine how much money a debtor has to make this first payment makes some sense; (4) Congress was fully aware of the consequences flowing from the use of a historical number to calculate a debtor's future ability to pay; and (5) all the Bankruptcy Code sections cited by eCast have vitality outside of the disposable income determination of § 1325(b), and none are rendered meaningless by failing to adopt eCast's arguments.

First, the court does not see any reason for Congress to have intended two separate definitions: one for "disposable income," which is specifically defined in § 1325(b)(2), and a second for "projected disposable income," which is nowhere defined in the Bankruptcy Code. Rather, the court understands "projected" to modify "disposable income," as that term is defined in § 1325(b)(2). Considering that "disposable income" is specifically defined to be "current monthly income" less certain expenses, and further considering that "current monthly income is itself defined in § 101(10A) to mean the debtor's six month historical average, the most natural conclusion is that a determination of "disposable income" begins with a six-month historical average of the debtor's earnings, which is then projected onto the duration of the applicable commitment period. *E.g.*, *In re Kolb*, 366 B.R. 802, 816 (Bankr. S.D. Ohio 2007) ("[T]he word 'projected' cannot modify the definition of 'disposable income' in the dramatic fashion some

10

courts have suggested without rendering the definition meaningless and irrelevant."); *Alexander*, 344 B.R. at 749 ("If 'disposable income' is not linked to 'projected disposable income' then it is just a floating definition with no apparent purpose.").

Second, § 1325(b)(1)(B)'s use of the term "projected disposable income to be received" is not new. *Coop v. Frederickson (In re Frederickson)*, 375 B.R. 829 (B.A.P. 8th Cir. 2007) ("While BAPCPA modified the Code definition of 'disposable income' to incorporate the new term 'current monthly income' as defined elsewhere in the Code, BAPCPA did not redefine 'projected disposable income.'"). As stated by the Court of Appeals of the Fourth Circuit before the enactment of BAPCPA, "'[r]ather than engaging in hopeless speculation about the future,' a court should determine projected disposable income by calculating a debtor's 'present monthly income and expenditures' and extending those amounts over the life of the plan." *Solomon v. Cosby (In re Solomon)*, 67 F.3d 1128, 1132 (4th Cir. 1995) (citation omitted). *See also Anderson v. Satterlee (In re Anderson)*, 21 F.3d 355, 357 (9th Cir. 1994) (noting that "projected" disposable income was not the same as the debtor's actual disposable income that the debtor may receive after confirmation; projected disposable income was determined by multiplying the debtor's current income by 36); *In re Killough*, 900 F.2d 61, 64 (5th Cir. 1990) ("The bankruptcy court must take two steps in relation to [determining projected disposable income]. Initially, it must project the income of the debtor 'over the next three years.' For practical purposes, this task is usually accomplished by multiplying the debtor's monthly income by 36. Next, the bankruptcy court must assess the amount of the debtor's income that is 'disposable.') (citation omitted).

Because no changes were made to the term "projected disposable income to be received" in § 1325(b)(1)(B), the general interpretation afforded to that phrase by the Fourth Circuit, and others, continues to be applicable. Therefore, no basis exists to conclude – after the enactment of BAPCPA – that Congress intended to alter the general method by which courts were projecting a debtor's disposable income over the debtor's plan commitment period. *E.g.*, *Anderson*, 21 F.3d at 357 (holding that post-confirmation actual disposable income was not required to be committed by a debtor to the plan pursuant to § 1325(b); actual post-petition income is different from pre-petition projected disposable income to be received under a Chapter 13 plan); *In re Buck*, No. 07-31513, 2007 Bankr. LEXIS 4272 (Bankr. E.D. Va. Dec. 14, 2007) ("In view of the detailed changes Congress made to the definition of 'disposable

11

income,' coupled with the historical application of the unaltered term 'projected,' this Court can only conclude that Congress intended for the amount derived from application of the newly defined term 'disposable income' to be projected out over the applicable commitment period."); *In re Hanks*, 362 B.R. 494, 499 (Bankr. D. Utah 2007) ("In 'projecting' a return to general unsecured creditors under the BAPCPA for above-median debtors, this Court's view is that its new function is solely to multiply the net 'disposable income' figure as calculated on Form B22C by the applicable commitment period. No more, no less.").

Of course, under pre-BAPCPA law, bankruptcy courts sometimes deviated from the debtor's income and expenses listed on Schedules I & J based on known increases or decreases in either income or expenses. Because no alterations were made by BAPCPA to the phrase "projected disposable income" some argument exists that, because bankruptcy courts deviated from Schedules I & J pre-BAPCPA, this practice can continue. *E.g.*, *In re Lanning*, No. 07-67, 2007 Bankr. LEXIS 4107 at *17-18 (B.A.P. 10th Cir. Dec. 13, 2007) ("[I]f the [pre-BAPCPA] bankruptcy court had reason to believe that those schedules did not accurately predict a debtor's actual ability to pay, other evidence was also considered."). The *Lanning* Court used this past practice as a justification for allowing a departure from Form B22C in exceptional post-BAPCPA cases:

> Although the amendments to section 1325 specify the formula by which to determine a debtor's median standing, as well as the monthly disposable income as of the date of the petition, they give us no reason to believe that Congress intended to eliminate the bankruptcy courts' discretion to deviate from an application of that formula where significant circumstances support doing so.

*Id.* at *18.

Unlike the general, pre-BAPCPA interpretation of how to "project" disposable income over the life of the plan, which this court believes is consonant with the amendments to § 1325(b), the pre-BAPCPA practice of adjusting a debtor's disposable income calculation based on known, significant circumstances is dissonant with the structure of the BAPCPA amendments and this prior practice should not be continued. Contrary to *Lanning's* reasoning, the amendments to § 1325 specifying the formula by which a court may determine a debtor's monthly disposable income as of the date of the petition is a clear indication that

12

Congress intended to erode this particular past bankruptcy practice. Indeed, one of the cornerstones of BAPCPA is to take discretion away from bankruptcy judges in favor of more uniform standards. *See supra*, *Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256, H.R. Rep. No. 109-31*; *Eliminating the Judicial Function in Consumer Bankruptcy*; *Ten Principles of BAPCPA: Not What Was Advertised*; *Bankruptcy Criticisms.* Congress has spoken sufficiently clear that the old rules employed by the bankruptcy court for determining disposable income are no longer adequate, and the new statutory formula of §§ 1325(b)(2) and 101(10A) are meant to replace – rather than supplement – the bankruptcy court's pre-BAPCPA discretionary practice of adjusting the Schedule I & J numbers to conform with the bankruptcy court believes is a more accurate portrayal of a debtor's ability to pay.[3]

Third, the court does not believe that § 1325(b)(1)'s statement that a debtor commit all of the debtor's projected disposable income "as of the effective date of the plan" requires that a debtor's income be measured as of the effective date of the plan, which is usually occurs shortly after confirmation. Quite simply, § 1325(b)(1)(B) requires that a debtor submit all projected disposable income "beginning on the date that the first payment is due under the plan . . . ." A debtor's first payment is due under a plan not later than 30 days after the petition date. § 1326(a)(1). In this District, the length of the Chapter 13 plan generally runs from the time of the first plan payment under § 1326(a)(1). Accordingly, using a debtor's pre-petition income to project the amount of disposable income available to make that first payment makes sense.

---

[3] When Congress enacts a new statute, "it is presumed that the legislature intended to change existing law." 73 Am. Jur. 2d *Statutes* § 65 (2007). Likewise, a construction of a statute is favored when the construction defeats "evasions employed to continue the mischief sought to be remedied by the statute." *Id.* at § 167. In *Cohen v. De La Cruz*, 523 U.S. 213, 221 (1998), the Court stated that when Congress made "stylistic changes" to § 523(a)(2)(A), it would not read the amended statute to "erode past bankruptcy practice" because there was no "clear indication that Congress intended such a departure." Here, Congress intended to change the existing law regarding the disposable income test of § 1325(b) because the changes to the disposable income test of § 1325(b) are not stylistic – they are substantive and extensive. Also, the perceived mischief of allowing too much discretion to the sundry bankruptcy courts would be defeated should the bankruptcy courts allow litigants to avoid the effects of the new statute merely by arguing that the application of the statutory formula would produce an unwise – but not absurd – result.

13

Fourth, it cannot be said that Congress's requirement that projected disposable income be determined with reference to a debtor's six month historical income average was unintended. As reported by Judge Leonard:

> As noted by authors Culhane and White, Chapter 13 trustees notified Congress of their concerns regarding this legislation before it was passed:
>
> > Chapter 13 trustees recognized early on that this redefinition of disposable income meant some high-income debtors would pay less than they would have under the variant judicial tests and local legal culture that previously measured the chapter 13 disposable income. The chapter 13 trustees repeatedly made their concerns known to Congress, asking that CMI less deductions be a minimum, not the maximum, but no changes were made.
>
> Marianne B. Culhane & Michaela M. White, *Catching Can-Pay Debtors: Is the Means Test the Only Way?*, 13 Am. Bankr. Inst. L. Rev. 665, 681 (2005). "As in *Lamie*[ *v. United States Tr.*, 540 U.S. 526 (2004)], 'this alert, followed by the Legislature's nonresponse, should support a presumption of legislature awareness and intention.'" *Id*. (quoting *Lamie*, 540 U.S. at 541). However, even if this law is producing unintended results, it is the job of Congress to amend the statute. *Lamie*, 540 U.S. at 542. "'It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.'" *Lamie*, 540 U.S. at 542 (quoting *US v. Granderson*, 511 U.S. 39, 68, 114 S. Ct. 1259, 127 L. Ed. 2d 611 (1994) (concurring opinion)).

*Alexander*, 344 B.R. at 747-48.

Fifth, this court does not find merit in eCast's characterization of the Bankruptcy Code as requiring a forward looking determination when calculating a debtor's disposable income under § 1325(b). The requirements for confirmation of a Chapter 13 plan are plainly set forth in § 1325(a). If all nine applicable subparagraphs of § 1325(a) are met, then the court "shall confirm" the plan. The contents of the plan itself is dictated by § 1322(a), which in pertinent part, requires that the plan "provide for the submission of all of such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." § 1322(a)(1). Nothing in § 1322(a) requires that a debtor submit all the debtor's disposable income to a Chapter 13 plan; rather, that requirement is found in § 1325(b) – not subsection (a) – and it is only applicable in the event that the Chapter 13 trustee or the holder of an unsecured claim specifically makes the objection at the time of confirmation. *E.g., In re*

14

*Brumm*, 344 B.R. 795 (Bankr. N.D.W. Va. 2006) (By [§ 1325(b)'s] express language, it requires that an objection be made at or before confirmation of the plan.").

Similarly, eCast's reliance on 11 U.S.C. § 1306(a) to demonstrate that a determination of a debtor's disposable income under § 1325(b) should be divorced from Form B22C is misguided. Section 1306(a)(2) provides that a debtor's post-petition earnings are property of the estate. In fact, § 1325(b), as implemented by Form B22C is already forward looking in that it requires a debtor to submit a certain amount of a debtor's future earnings to the Chapter 13 plan. The purpose of § 1306(a)(2) is to define what constitutes property of the estate in a Chapter 13 case – § 1306(a)(2) does not require that any portion of estate property be paid to creditors under a plan.

Regarding eCast's reliance on § 521(a)(1)(B)(iv) (requiring the debtor to file a statement at the beginning of the case that discloses any reasonably anticipated increase in income or expenditures over the 12-month period following the filing of the petition), the court notes two things. One is that § 1325(b)'s inclusion of means testing expense standards only applies to above-the median income debtors, which constitute only a small percentage of total filers.[4] Presumably, in the vast majority of Chapter 13 cases the court is free to examine the debtor's anticipated, future expenses in making disposable income determinations free from the application of the means test. The second is that requiring a debtor to disclose anticipated future increases in income and expenditures at the outset of the case under § 521(a)(1)(B)(vi) assists the USTE in determining whether abuse is present under § 707(b)(3)(B) (providing that the court shall consider the totality of the circumstances of the debtor's financial circumstances in determining whether abuse is present in a Chapter 7 case).

Finally, the hanging paragraph following § 521(f)(4)(B), which requires a debtor to, on request, file a statement of the income and expenditures of the debtor during the tax year most recently concluded, must be read in context with a party's right to seek a post-confirmation modification of a plan under §

---

[4] For example, only about 27% of all Chapter 13 debtors have an income that is above the state median. Clifford J. White III, Executive Office for U.S. Trustees, *Making Bankruptcy Reform Work: A Progress Report in Year 2*, 26-5 A.B.I.J. 16, 16 (June 2007) ("In practice, the IRS Standards apply only to those debtors with income above their state median income, which is about 8 percent of chapter 7 debtors and about 27 percent of chapter 13 debtors.").

1329(a) (providing, in part, that any time after confirmation of the plan, the plan may be modified to increase or reduce the amount of payments on claims).  Importantly, § 1325(b) does not apply in the context of a plan modification; thus, a party would presumably be free to seek to increase or reduce plan payments so long as that party can show a substantial and unanticipated change in circumstances since the time of confirmation.  *E.g.*, § 1329(b)(1) (providing that, on modification, the requirements of § 1325(a) – not § 1325(b) – are applicable); *In re Arnold*, 869 F.2d 240, 243 (4th Cir. 1989) ("The doctrine of res judicata bars an increase in the amount of monthly payments only where there have been no unanticipated, substantial changes in the debtor's financial situation."); *Brumm*, 344 B.R. at 798 (holding that a § 1325(b) objection must be raised at the time of confirmation and was not a consideration in the standards for modifying a confirmed plan); Keith M. Lundin, *Chapter 13 Bankruptcy*, 3d Ed. §§ 255.1, 506.1 (2006) (noting a split of authority on the issue).

Consequently, the subsections cited by eCast all have specific relevance outside of determining a debtor's disposable income under § 1325(b) and none of those provisions is rendered surplusage by failing to use Schedules I and J, as was done before the enactment of BAPCPA, to determine a debtor's disposable income.  In sum, the court can find no basis for ignoring the language of § 1325(b) and its mandate regarding how to calculate a debtor's "current monthly income."

### b.      Presumption of Projected Disposable Income

Much like the court, the USTE recognizes that Form B22C must serve some purpose and cannot be discarded in favor of pre-BAPCPA practice.  In the USTE's view, "[t]he Court should adopt an interpretation of section 1325(b) that not only gives meaning to the new definition of 'disposable income' in section 1325(b)(2) as an historical number but that also properly treats 'projected' disposable income as a future-oriented concept, as required by the language of section 1325(b)(1)."   Under the USTE's approach, "the debtor's historical income and means testing expense amounts are a starting point, and should be carried forward throughout the term of the plan, absent evidence to the contrary."  *E.g.*, *Kibbe v. Sumski (In re Kibbe)*, 361 B.R. 302, 314-15 (B.A.P. 1st Cir. 2007) ("The calculation of disposable income according to Form B22C cannot be determinative of the debtor's 'projected disposable income' because it does not take into account the debtor's circumstances as of the petition date or foreseeable changes in circumstances in income during the plan commitment period."); *In re Slusher*, 359 B.R. 290,

16

293 (Bankr. D. Nev. 2007) ("[T]his court holds that line 58 of Form B22C is a presumptive, but not an exclusive, basis for calculating 'projected disposable income'. . . ."); *In re Risher*, 344 B.R. 833, 836-37 (Bankr. W.D. Ky. 2006) ("The numbers resulting from the calculations on Form B22C represent a starting point for the Court's inquiry. . . . Such a construction gives the Court the ability to evaluate the debtor's past and current financial status to determine a debtor's disposable income when a debtor's circumstances change from the six months preceding the filing of the petition.").

Like the Trustee and eCast, the USTE reaches this conclusion based on the term "projected disposable income" as it is used in § 1325(b)(1)(B). The term "projected," the USTE asserts, is forward looking, and the trustee, creditors, and the debtor must have an opportunity to offer rebutting evidence as to changed circumstances or else the interpretation of "projected disposable income" may degenerate into absurdity should the court require the parties to strictly adhere to Form B22C.

In this case, however, the Debtor's income stream has not unduly varied over the six months before the filing of the petition. Thus, the court does not need to reach the merits of the USTE's argument in this case regarding a calculation of the Debtor's future income because the Debtor has not experienced, and is not anticipated to experience, any significant, future income changes that would require a deviation from that stated in Form B22C. *E.g.*, *In re Lanning*, No. 07-067, 2007 Bankr. LEXIS 4107 at *20 (B.A.P. 10th Cir. Dec. 13, 2007) (holding that the mathematical determination of disposable income in § 1325(b) is a starting point only when the debtor can prove a substantial change in circumstance justifying a deviation from the formula; a "deviation from the Form B22C determination of disposable income will be the exception rather than the rule."). The USTE's arguments regarding consideration of expenses will be more fully considered, *infra*, Part B.

### c.    Form B22C is Determinative of Projected Disposable Income

As advocated by the Debtor, and contrary to the reasoning of the Trustee and eCast (and with the approach taken by the USTE), a third line of authority concludes that Form B22C serves the purpose of determining a debtor's disposable income under § 1325(b); thus, it is improper for a court to ignore this directive by continuing to use Schedules I & J as was done before the enactment of BAPCPA. *E.g.*, *In re Austin*, No. 07-10031, 2007 Bankr. LEXIS 2584 at *18 (Bankr. D. Vt. Aug. 7, 2007) ("There can be little doubt that § 1325(b)(2), by incorporating CMI as the basis for a debtor's income, relies upon

17

income data from the pre-petition period. The statute makes no reference to any other income and since 'current monthly income' is a defined term, the Court finds no support for using income from the date of filing or any other time period to compute 'disposable income.'"); *In re Winokur*, 364 B.R. 204, 206 (Bankr. E.D. Va. 2007) (stating that Congress specifically chose a formulaic approach for determining disposable income; therefore, using Schedules I and J, which represents an individualistic approach to determining disposable income, is improper); *Alexander*, 344 B.R. at 749 (projected disposable income means that the disposable income determination in Form B22C is multiplied by the number of months in the plan).

Concluding, as this court has, that (1) the word "projected" is best understood to modify "disposable income," as defined in §§ 1325(b)(2) and 101(10)(A); (2) the method for projecting disposable income over the life of a debtor's plan is to be accomplished by multiplying the determination of disposable income by the number of months in the plan; (3) the clear Congressional trend is to take away discretion from bankruptcy courts in making determinations as to disposable income, and (4) that, quite simply, the result is compelled by the plain language of § 1325(b), the court holds that Form B22C is the proper method for determining the Debtor's disposable income following a § 1325(b) objection, and that Schedules I & J may not be used for this purpose.

The court recognizes, however, that leaving real money on the table that is available to pay creditors of the estate is an anathema, especially considering that before the enactment of BAPCPA that money would have been paid to creditors. For example in this case, the Debtor is proposing a 60-month plan paying $571 per month. The Trustee and eCast contend that, at a minimum, the Debtor should be contributing $921 per month based on Schedules I & J. Over 60 months, this results in $21,000 being pocketed by the Debtor that previously would have been paid to the Debtor's creditors. This result, the Trustee and eCast contend, is unfair and contrary to the way Chapter 13 has worked in the past.

While legitimate criticisms exists concerning the disposable income test of § 1325(b) for above the median income debtors, this court is not at liberty to rewrite the statute, and, this court does not believe that

18

the result of the test in this case is absurd.[5]  The Debtor has proposed a feasible plan and is willing to comply with the complex minimum payment requirement established by the statutory formula specifically chosen by Congress.  This court simply does not have the power to replace this formula with the standard pulled from prior practice.[6]

**B.    Expenses for an Above the Median Income Debtor**

Two different types of objections are raised by the Debtor's claim of expenses.  First, eCast and the Trustee argue that the court should consider the Debtor's actual expenses as of the petition date and not rely on the standard expense deductions provided under the means test, which allows the Debtor to deduct certain expenses based on artificial IRS standards.  Second, the Trustee, eCast, and the USTE specifically object the manner in which the Debtor as applied particular expense deductions with respect to a paid-off vehicle and to a claim of excess expense amounts for home energy, food, and clothing costs.

**1.    Actual Expenses v. Artificial Expenses**

The objections asserted by eCast and the Trustee to the Debtor using the artificial expense deductions provided for in § 1325(b)(3), which incorporates § 707(b)(2)(A) and (B), largely mirror their arguments as to why the Debtor's disposable income should be determined based on Schedules I and J rather than form B22C.  Namely, the Trustee and eCast assert that "projected disposable income" is a forward looking concept and should not be rooted in the Debtor's pre-petition circumstances.  In particular, eCast asserts that the court should not allow the Debtor to claim housing and vehicle deductions

---

[5] Because the Debtor's plan as proposed is feasible and the court finds that making Chapter 13 plan payments in an amount mandated by Congress is not absurd, the Court has no basis in this case to address whether the result of following Form B22C could be so absurd that it cannot be followed. *See, e.g.*, 11 U.S.C. § 1325(a)(6) (requiring as a condition to confirmation that the debtor be able to make all payments under the plan); *In re Edmondson*, 363 B.R. 212, 218-18 (Bankr. D.N.M. 2007) (declining to follow Form B22C when doing so would produce absurd results, as for example, when a debtor lost a job shortly before filing).

[6] "Once again, Congress demonstrated a determination to replace judicial discretion under general standards with precise rules-based calculations.  One can understand why bankruptcy judges would chafe at such restrictions, but that does not mean that Congress did not mean what it said." Marianne B. Culhane & Michaela M. White, *Catching Can-Pay Debtors: Is the Means Test the Only Way?*, 13 Am. Bankr. Inst. L. Rev. 665, 681 (2005).

19

that are in excess of the Debtor's actual monthly expenditures.

The language of § 1325(b)(3) is plain and unambiguous: "Amounts reasonable necessary to be expended [in determining the extent of a debtor's disposable income] shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if [the debtor has income above the applicable State's median income]." In turn, § 707(b)(2)(A)(ii)(I) unambiguously provides: "The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides . . . ." As stated by Judge Wedoff:

> An initial question applicable to both the transportation and housing/utilities allowances is whether, under the means test, the amounts set out in Local Standards are fixed expense allowances, like those of the National Standards, or merely a cap on the debtor's actual expenses in the covered categories. The IRM plainly provides for the latter: "Unlike the national standards, the local standards for housing, utilities, and transportation serve as a cap. The taxpayer is allowed the local standard or the amount actually paid, whichever is less." However, because 707(b)(2)(A)(ii)(I) provides that the debtor's allowed expense deductions "shall be" the "amounts specified" under the Local Standards – and because the statute makes no provision for reducing the specified amounts to the debtor's actual expenses – a plain reading of the statute would allow a deduction of the amounts listed in the Local Standards even where the debtor's actual expenses are less.

Eugene R. Wedoff, *Means Testing in the New 707(b)*, 79 Am. Bankr. L.J. 231, 256-57 (2005).

Accordingly, considering the mandatory language of the statutes, the court believes that it is inappropriate to use the actual expenses of an above the median income debtor in making the determination of how much disposable income a debtor has to commit to a Chapter 13 plan in response to an objection under § 1325(b). *E.g.*, *Gress*, 344 B.R. at 922; Lundin, 24-7 A.B.I.J. at 69.

Thus, whether or not the Debtor's monthly expenses are above or below the amounts set forth in the National Standards and Local Standards is of no consequence. Some debtors will have expenses above those specified in the National and Local Standards, and if they wish to pursue confirmation of a Chapter 13 plan, will have to engage in some traditional belt-tightening. Others, such as the Debtor in this case, will have actual expense amounts below those specified in the National and Local Standards, and will

20

reap the benefits of being more frugal than their peers when a creditor or the Chapter 13 trustee files a §

1325(b) disposable income objection to confirmation of the debtor's proposed Chapter 13 plan.

### 2.    Specific Form B22C Expenses

The Trustee, eCast, and the USTE object to certain expenses claimed by the Debtor on Form

B22C.  More specifically, the parties assert that the Debtor improperly took a transportation expense

deduction for a vehicle that was paid-off, and that the Debtor has taken excessive home energy, food and

clothing expenses.

### a.    Transportation Expenses for Paid-Off Vehicles

Line 28 of From B22C allows a debtor to claim the Local Standard for transportation ownership

/ lease expense for a debtor's first vehicle.  The applicable Local Standard in this case for the first vehicle

is $471.00, less its average monthly secured debt payment (which is later accounted for in Line 47 of Form

B22C).  No party objects to the Debtor claiming a transportation ownership expense deduction with regard

to his first vehicle, a 2001 Jeep, for which the Debtor has unpaid secured debt obligations.  Line 29 allows

a similar deduction for a debtor's second vehicle.  The applicable Local Standard in this case for the

second vehicle is $332.  The Trustee, eCast and the USTE object to the Debtor claiming this expense with

regard to the Debtor's 1991 Buick on the grounds that the Debtor does not have any secured debt

obligations on his second vehicle.

Pursuant to 11 U.S.C. § 707(b)(2)(A)(ii)(I), "The debtor's monthly expenses shall be the

debtor's *applicable* monthly expense amounts specified under the . . . Local Standards . . . ." (emphasis

added).  In the USTE's view, an expense must first be applicable to the debtor before the specific Local

Standard may be included in the Debtor's allowed monthly expenses, *i.e.*, a debtor cannot claim the Local

Standard expenses unless the expense category actually applies to the debtor.  *E.g.*, *In re Wiggs*, No. 06-

70203, 2006 Bankr. LEXIS 1547 at *6 (Bankr. N.D. Ill. Aug. 4, 2006) ("This Court finds that the term

'applicable' modifies the amounts specified to limit the expenses to only those that apply.").  Given that the

Debtor in this case does not have an ownership or lease payment on his 1991 Buick, the USTE would

disallow the Debtor's $332 deduction.

Similarly, eCast objects to the Debtor claiming the $332 ownership expense for his 1991 Buick

on the basis that Internal Revenue Manual 5.15.1, Financial Analysis Handbook, at Section 5.15.17,

21

Allowable Expenses, No. 4 clearly states that "Taxpayers will be allowed the local standard or the amount actually paid, whichever is less." I.R.M. § 5.15.1.7 (Allowable Expense No. 4). Because the amount actually paid by the Debtor for the Buick's ownership expense is actually $0, eCast contends that the expense deduction should be denied.

i.      **Applicable Expenses or Applicable Local Standards**

Regarding the argument of the USTE, that the term "applicable" as used in § 707(b)(2)(A)(ii)(I), refers only to the expense categories for which the Debtor has a corresponding actual, applicable expense, the court rejects its interpretation as being too strained, and at odds with the plan language of the statute.

The most natural reading of § 707(b)(2)(A)(ii)(I) is that "applicable" modifies "the amounts specified" in the "Local Standards"; thus, "it references both the region of the country in which the debtor lives and the selection that must be made between the two columns that appear in the Local Standards, one for the first car and one for the second car." *In re Chamberlain*, 369 B.R. 519 (Bankr. D. Ariz. 2007) (stating that "[i]t takes a tortured reading to make 'applicable' refer to anything else."). As used in the statute, "applicable" does not modify "the debtor's monthly expenses," because that term occurs at the beginning of § 707(b)(2)(A)(ii)(I). *E.g.*, *In re Taylor*, No. 06-1348, 2006 Bankr. LEXIS 4352 at *3 (Bankr. E.D.N.C. Dec. 18, 2006) ("This court . . . hold[s] that . . . the term 'applicable' means the standards applicable to the debtor, not the actual expenses that are applicable to the debtor."). Indeed, in the English language the adjective usually comes before the noun being modified, and the syntax of § 707(b)(2)(A)(ii)(I) simply does not lead one to conclude that "applicable" a predicate adjective for "the debtor's monthly expenses."

To the extent that a statutory ambiguity might exist, the court notes that a prior version of the BAPCPA contained a specific reference to the Internal Revenue Manual's Financial Analysis Handbook from which the USTE and eCast are basing their arguments, but that reference was deleted in the version adopted by BAPCPA. *E.g.*, *In re Fowler*, 349 B.R. 414, 419 (Bankr. D. Del. 2006) ("The change from the prior version evidences Congress' intent that the Courts not be bound by the financial analysis contained in the IRM and lends credence to the Court's conclusion that it should look only to the amounts set forth in the Local Standards."). Likewise, Congress was well aware in enacting BAPCPA that a debtor's actual expenses were being ignored in conducting the means testing analysis. *Report of the Committee on the*

22

*Judiciary, House of Representatives, to Accompany S. 256, H.R. Rep. No. 109-31*, Pt. 1, p. 553, 109th Cong., 1st Sess. (2005) (stating that the means testing "formula remains inflexible and divorced from the debtor's actual circumstances.") (dissenting views).

Accordingly, this court will no unduly contort the statutory language to achieve a result that is not a natural reading of the statute and one that appears to be contrary to Congressional intent.

### ii.        Use of the Internal Revenue Manual

Regarding eCast's assertion that the Internal Revenue Manual limits the transportation ownership expense amount to the lesser of the Local Standard or the amount actually paid, Judge Wedoff has aptly considered, and rejected, this argument:

> [T]here is a question of whether an ownership expense may be claimed by a debtor who owns a car free of any lien. The language quoted from the IRM states that if the debtor makes no car payments, the ownership expense amount may not be claimed. Indeed, this result follows necessarily from the IRM's treatment of the Local Standards as caps on actual expenditures: if a taxpayer has no car payments, the taxpayer obviously cannot claim a Local Standard amount intended to cap actual car payment expenses. However, since the means test treats the Local Standards not as caps but as fixed allowances, it is more reasonable to permit a debtor to claim the Local Standards ownership expense based on the number of vehicles the debtor owns or leases, rather than on the number for which the debtor makes payments. This approach reflects the reality that a car for which the debtor no longer makes payments may soon need to be replaced (so that the debtor will actually have ownership expenses), and it avoids arbitrary distinctions between debtors who have only a few car payments left at the time of their bankruptcy filing and those who finished making their car payments just before the filing.

Eugene R. Wedoff, *Means Testing in the New 707(b)*, 79 Am. Bankr. L.J. 231, 256-57 (2005). *See also In re Megginson*, No. 06-12034, 2007 Bankr. LEXIS 3112 at *17 (Bankr. D. Md. Sept. 5, 2007) ("Debtors are entitled to claim the full amount of the transportation exclusion regardless of whether or not they are obligated to make car payments."); *In re Hylton*, No. 07-70320, 2007 Bankr. LEXIS 3023 at *9 (Bankr. W.D. Va. Aug, 22, 2007) ("This court finds the arguments for permitting the fixed ownership allowance persuasive."); *In re Lynch*, 368 B.R. 487, 491 (Bankr. E.D. Va. 2007) ("The court has reviewed the arguments in each of these cases and is compelled by the reasoning and result of four of the published cases decided by bankruptcy courts in the Fourth Circuit allowing the deduction . . . ."); *In re*

23

*Enright*, No. 06-10747, 2007 Bankr. LEXIS 812 at *22 (Bankr. M.D.N.C. March 6, 2007) ("[T]he plain language of Section 707(b)(2)(A)(ii)(I) permits the Debtor to take the transportation-ownership allowance on her vehicle even though it is not encumbered or leased.").

Like Judge Wedoff, this court finds no basis in the statute for grafting the Internal Revenue Manual into the Bankruptcy Code. Nothing in the Bankruptcy Code or Rules makes a reference to an IRS publication, and the IRS is not an agency that administers the Bankruptcy Code. As observed by Judge Haines:

> In § 707(b) Congress adopted the Standards, not other IRS publications interpreting or applying them. Nor did it instruct courts to allow expense deductions in the amount an IRS field agent would allow in deciding whether to settle a tax debt for a less than the amount owed, sort of an Erie-type guess as to what another entity would conclude. Congress' use of the word "specified" could not be much clearer in indicating the Standards govern, not what the IRS would allow.
>
> Indeed, the language of the IRS Manual provides two additional reasons why § 707(b) should not be interpreted as the Trustee urges. First, the fact that the IRS had to make that explanation in the Manual indicates its recognition that the Standards themselves do not indicate they impose maximums, and are not to be used if the debtor has no debt service on the vehicle. Second, the language of the Manual provided a model that Congress could easily have adopted if that were its intent. Congress' choice not to use the language of the Manual implies that it did not intend the same result.

*In re Chamberlain*, 369 B.R. 519 (Bankr. D. Ariz. 2007). *See also In re Hice*, 376 B.R. 771 (Bankr. D.S.C. 2007) ("The IRS's standards for determining who can and cannot pay taxes are different from the standard found in the Means Test applicable to bankruptcy proceedings.").

Likewise, this court also concludes that the language of 11 U.S.C. § 707(b)(2)(A)(ii)(I) is plain and unambiguous, and that no basis exists for the court to allow the National or Local Standards to be spliced based on what an IRS field agent would do when dealing with a delinquent taxpayer.

### 3.     Excess Home Energy Costs & Food and Clothing Expenses

When the Debtor filed his December 29, 2006 bankruptcy petition he claimed gross monthly income of $6,807. Under the applicable National Standard, he was entitled to claim $940 in monthly food

and clothing expenses for a household of two,[7] and under the Local Standard the Debtor claimed a housing and utilities expenses $966. In addition to these deductions, the Debtor claims $390 in extra home energy costs in excess of the amounts specified in the Local Standards, and $50 in extra food and clothing costs. The Trustee asserts that the Debtor's extra home energy, food, and clothing costs should be disallowed as being unsupported and in excess of the National and Local Standards.

Section 707(b)(2)(A)(ii)(I) o f the Bankruptcy Code provides that, "if it is demonstrated that it is reasonable and necessary, the debtor's monthly expense may also include an additional allowance for food and clothing of up to 5 percent of the food and clothing categories as specified by the National Standards issued by the Internal Revenue Service." In addition, § 707(b)(2)(A)(ii)(V) states that "the debtor's monthly expenses may include an allowance for housing and utilities, in excess of the allowance specified by the Local Standards for housing and utilities issued by the Internal Revenue Service, based on the actual expenses for home energy costs if the debtor provides documentation of such actual expenses and demonstrates that such actual expenses are reasonable and necessary."

The Internal Revenue Local Standard for housing and utility expenses includes amounts to be expended on mortgage payments, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, telephone, and cell phone. No specific breakdown of the included expenses are provided in the applicable Local Standard. In responding to the Trustee's and eCast's § 1325(b) disposable income objection, the Debtor provided monthly receipts showing that, on average, the Debtor spends $486.12 per month on water, power and gas bills ($95.10 water, $80.40 power, $310.62 gas). As stated, the Debtor is entitled to claim a total of $966 to cover the expenses listed in Local Standard for housing and utility expenses, and the home energy costs must be in excess of this amount.

Similarly, the Debtor asserts that he is entitled to claim an additional $50 per month in excess food and clothing expenses over that allowed by the National Standards on the basis that his job requires him to travel between two hospital locations, which, necessitates that he eat out more often. The applicable

---

[7] On Line 24, the Debtor claimed $1,306 as the applicable National Standard for food, clothing, household supplies, personal care, and miscellaneous. Of that amount $723 is the food allowance, $49 is allotted to household supplies, $217 to apparel and services, $57 to personal care products and services, and $110 for miscellaneous. The total food and clothing expenses are $940.

National Standards in this case for food is $723, and the applicable National Standard for clothing is $217. Thus, the maximum amount that the Debtor could claim is an additional $36.15 for food, and $10.85 for clothing. The court is puzzled, however, as to why the Debtor is even attempting to claim excess expenses for food and clothing when the Debtor states on Schedule J that he only expends $600 per month in food and $200 in clothing.

Because the court has not held an evidentiary hearing with respect to the Debtor's claim for excess home energy, food, and clothing costs, the court will set a further hearing and allow the Debtor to introduce evidence and/or testimony regarding his additional costs. The failure of the Debtor to properly document these excess expense claim could result in an additional $440 per month that must be devoted to the payment of unsecured creditors in the Debtor's Chapter 13 plan.

## CONCLUSION

For the above stated reasons, the court will deny eCast's objection to confirmation of the Debtor's proposed Chapter 13 plan, and will deny in part the Trustee's objection to confirmation of the Debtor's proposed plan. The court will set an evidentiary hearing at which time the Debtor will be given the opportunity to introduce evidence and testimony regarding his claim of home energy, food, and clothing expenses in excess of the National and Local Standards. The court will enter a separate order pursuant to Fed. R. Bankr. P. 9021.

27